In The Matter Of RUBY FRICK

No. 8010DC445

(Filed 21 October 1980)

**Insane Persons § 1.2– involuntary commitment – dangerousness to self – sufficiency of findings**

The trial court's determination in an involuntary commitment proceeding that respondent was dangerous to herself was supported by the court's findings, which in turn were supported by competent evidence, that respondent had no home or place to stay; in the past respondent had lived in her automobile except for nights spent in motel rooms with men she met in motel lounges; respondent was not able to say what she was going to do to make money in order to get a place to stay or to be able to eat; she exhibited a thought disorder and impaired judgment relating to plans for self-care; she exhibited a psychotic mood disorder with pressured speech, loose associations, tangential thinking, and labile emotions, often laughing or singing inappropriately and switching to crying; and, if released, respondent would become psychotically manic, would decompensate rapidly, and her psychiatric decompensation would likely lead to fights associated with prostitution and money.

APPEAL by respondent from *Bason, Judge.* Order entered 24 January 1980 in District Court, WAKE County. Heard in the Court of Appeals on 7 October 1980.

This is an appeal from an involuntary commitment proceeding held pursuant to G.S. § 122-58.7. After a hearing, Judge Bason made the following pertinent findings and conclusions:

1. Respondent is separated from her husband and her husband has custody of their children, living in their home in Albemarle.

. . .

4. On arriving in Raleigh in July 1979, respondent began living in her automobile.

5. Respondent continued to live in her automobile except when occupying someone else's motel room in Raleigh, from July 1979, until she unlawfully returned to the premises of her husband and children, which caused her to be convicted on trespass charges and imprisoned at Women's Correctional Center for a little over one month shortly preceding her admission to the hospital. Respondent's

automobile was placed in storage in Albemarle where it remains to this date.

6. While living in her automobile in Raleigh respondent would, from time to time, frequent lounges at motels where she would meet men and go with them to their motel rooms to spend the night.

7. Respondent acknowledged that on one occasion after leaving prison while her automobile was still in storage in Albemarle, she went with a man from a lounge to his room for prostitution. Respondent stated in court, "I was forced to do this."

8. On that occasion respondent was to sell herself for $20.00. Respondent managed to get possession of the $20.00 and left the room. She denied performing the sexual act, but does not consider her conduct as stealing.

.  .  .

10. Immediately preceding respondent's admission to Dorothea Dix Hospital she was brought to the W.H. Trentman Mental Health Center in Raleigh where she was seen by Dr. Zarzar.

11. Respondent was not eligible for day hospital treatment because she had no place to stay, no home; and Dr. Zarzar initiated this proceeding for involuntary commitment with a petition.

12. At the time of admission to Dorothea Dix Hospital respondent was not able to say what she was going to do to make money in order to get a place to stay or to be able to eat. She had nowhere to go. She had no plans for where to go, other than back to her car (in storage) or to go back to her husband's house (where she was arrested for trespass).

13. At the time of admission to the hospital respondent exhibited a thought disorder and impaired judgment relating to plans for self care. She exhibited a psychotic mood disorder with pressured speech, loose associations, tangential thinking and labile emotions, often laughing or singing inappropriately and switching to crying.

14. Respondent suffers from manic depressive illness.

15. Respondent has been a patient at Dorothea Dix Hospital on three previous occasions.

. . .

18. Respondent would become psychotically manic if released. She would decompensate rapidly. Her psychiatric decompensation is likely to lead to fights associated with prostitution and money.

. . .

The Court concludes as a matter of law that respondent is dangerous to herself in that: (a) she would be unable without care, supervision and the continued assistance of others, not otherwise available, to exercise self-control, judgment and discretion in the conduct of her daily responsibilities and social relations, and unable to satisfy her need for nourishment, personal or medical care, shelter, self protection and safety; and (b) by reason of respondent's severely impaired insight and judgment there is a reasonable probability of serious physical debilitation to herself within the near future unless adequate treatment is afforded.

From an order committing respondent to Dorothea Dix Hospital for a period not exceeding ninety days, respondent appealed pursuant to G.S. § 122-58.9.

*Attorney General Edmisten, by Associate Attorney Steven F. Bryant, for the State.*

*Dorothy E. Thompson, for the respondent appellant.*

HEDRICK, Judge.

Respondent contends in her first assignment of error, based on Exceptions nos. 1, 2, and 3, that Findings of Fact nos. 7, 8, and 18 are not supported by the evidence. We disagree. At the hearing, respondent testified:

I'm talking about staying with people that I've met. Some of these are men. But in my book you have to accept charity where charity is offered. And if you can handle the situation, I feel like. I meet these men at the lounge. No, no I don't go for stuff like that but it's better than, if my car is in Albemarle, I was forced to do this.

Respondent further testified that on one occasion she was at Jonnie's Lounge, where

> there was this guy who kept wanting me to you know, but I said well if I'm not going to sleep anyway I might as well get up and walk somewhere else. Because this kind of thing I can't, well he had offered me twenty dollars so I just picked it up and carried it with me. If you want to call it stealing, I don't, because one way or the other it would have been dirty money.

In addition, Dr. Fahs, who had respondent under his care while she was at Dorothea Dix Hospital, testified that "[w]ere Ms. Frick not receiving treatment at this hospital, I would be afraid that she would become psychotically manic again" and that "I would be afraid that she would decompensate rapidly again and maybe endanger herself." Dr. Fahs also testified that "[i]n her condition" respondent had been arrested for trespassing, but "[i]t may not be so benign next time," and that "with her psychiatric decompensation I feel [it] would likely lead to fights, . . ." We think it patently obvious from this testimony that the challenged findings of fact are amply supported by the evidence and thus this assignment of error is meritless.

By his second assignment of error, respondent contends that there is "insufficient competent evidence to support a conclusion that the respondent is dangerous to herself." We do not agree. G.S. § 122-58.7(i) provides in pertinent part as follows:

> To support a commitment order, the court is required to find, by clear, cogent, and convincing evidence, that the respondent is mentally ill or inebriate, and dangerous to himself or others, . . . The court shall record the facts which support its findings.

The phrase "dangerous to himself" is defined in G.S. § 122-58.2(1)(a) as follows:

> "Dangerous to himself" shall mean that within the recent past:
>
> > 1. The person has acted in such manner as to evidence:
> >
> > > I. That he would be unable without care, supervision, and the continued assistance of others not

otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

II. That there is a reasonable probability of serious physical debilitation to him within the near future unless adequate treatment is afforded pursuant to this Article. A showing of behavior that is grossly irrational or of actions which the person is unable to control or of behavior that is grossly inappropriate to the situation or other evidence of severely impaired insight and judgment shall create a prima facie inference that the person is unable to care for himself; . . .

Our function on this appeal is to determine whether the court's ultimate finding that respondent was dangerous to herself is indeed supported by the facts which the court recorded in its order as supporting that finding, and whether, in any event, there was competent evidence to support such a finding. *Matter of Hernandez*, 46 N.C. App. 265, 264 S.E. 2d 780 (1980); *Matter of Hogan*, 32 N.C. App. 429, 232 S.E. 2d 492 (1977). *See also Matter of Monroe*, 49 N.C. App. 23, 270 S.E. 2d 537 (1980).

In the instant case, the court found and recorded as facts that at the time of her admission to Dorothea Dix Hospital, respondent "was not able to say what she was going to do to make money in order to get a place to stay or to be able to eat;" that she "exhibited a thought disorder and impaired judgment relating to plans for self-care;" that she "exhibited a psychotic mood disorder with pressured speech, loose associations, tangential thinking, and labile emotions, often laughing or singing inappropriately and switching to crying;" and that respondent "would become psychotically manic if released" and "would decompensate rapidly," "likely" leading to "fights associated with prostitution and money." In our view, the facts found and recorded by the court show by clear, cogent and convincing evidence that respondent is "dangerous to herself." Furthermore, after a careful review of the evidence adduced at the hearing, we believe that the court's determination is sup-

ported by competent evidence.

This assignment of error is without merit.

The order appealed from is

Affirmed.

Judges MARTIN (Robert M.) and MARTIN (Harry C.) concur.