IN THE MATTER OF: JERRY WEBBER, RESPONDENT

No. COA08-1488

(Filed 8 December 2009)

**1. Mental Illness— recommitment orders—impermissible collateral attack on prior order**

Respondent was not able to undo subsequent recommitments by challenging the prior final order that he did not appeal. Respondent's appeal from the present commitment order was an impermissible collateral attack on the prior order. Respondent was required to appeal the prior order under N.C.G.S. § 122C-272 or request a supplemental hearing under N.C.G.S. § 122C-274(e). The trial judge thus had the authority to order his recommitment.

**2. Mental Illness— outpatient commitment—clear, cogent, and convincing evidence**

The trial court did not err by its findings of fact under N.C.G.S. § 122C-263(d)(1)(c) regarding whether, without treatment, respondent's psychiatric condition would deteriorate and predictably result in dangerousness because the trial court's handwritten findings of fact combined with Dr. Godfrey's incorporated report provided sufficient detail to meet the statutory requirements and to permit appellate review.

IN RE WEBBER

[201 N.C. App. 212 (2009)]

### 3. Mental Illness— finding that condition would deteriorate and could likely become dangerous—psychiatric history

The trial court did not err by finding that respondent's condition would deteriorate and that he could likely become dangerous because Dr. Godfrey's testimony, in conjunction with respondent's. own testimony, provided sufficient support for the trial court's determination under N.C.G.S. § 122C-263(d)(1)(c). Under N.C.G.S. § 122C-263(d)(1)(c), the State was only required to prove that respondent was in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness as defined by N.C.G.S. § 122C-3(11).

Appeal by respondent from order entered 14 May 2008 by Judge Meredith A. Shuford in Cleveland County District Court. Heard in the Court of Appeals 20 May 2009.

*Attorney General Roy Cooper, by Assistant Attorney General M. Elizabeth Guzman, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender David W. Andrews, for respondent-appellant.*

GEER, Judge.

Respondent Jerry Webber appeals from the trial court's order recommitting him to a third 180-day period of involuntary outpatient treatment. Mr. Webber primarily contends that because his initial commitment order in 2007 provided for a term of outpatient commitment that exceeded the period authorized by the governing statute, the initial commitment period expired as a matter of law, and, as a consequence, the trial court lacked jurisdiction to enter subsequent commitment orders. Because Mr. Webber failed to appeal from the initial order or request a supplemental hearing as permitted by statute, Mr. Webber's appeal from the present commitment order amounts to an impermissible collateral attack on the prior order. We hold, therefore, that the trial court had subject matter jurisdiction when entering the order on appeal. As we find Mr. Webber's remaining arguments unpersuasive, we affirm.

### Facts

On 11 May 2007, just prior to Mr. Webber's discharge from Broughton Hospital, a petition and affidavit was filed requesting that Mr. Webber be involuntarily committed. The petition alleged:

Respondent is a ddanger [sic] to himself and others. He is threatening others. He has given a date [after his release] that he is going to kill severqal [sic] people and himself. He is diagnosed as paranoid/schizophrenia. He has not taken meds for over a year. He is being released from Broughton on Friday aftrernoon [sic]. Upon conversations yesterday, he presented delusional and psychotic and could not carry on a conversation. His family is afraid of him[.]

Based on the allegations in the petition, a magistrate ordered law enforcement to take Mr. Webber into custody and transport him for an examination by a psychiatrist or eligible psychologist.

Two evaluations were performed at King's Mountain Hospital, both determining that Mr. Webber was mentally ill and dangerous to himself, and one also concluding that Mr. Webber was dangerous to others. Dr. Ramesh Gihwala, one of the doctors who examined Mr. Webber, stated in a report dated 18 May 2007 that, in her clinical opinion, he had been "inadequately medicated" and was not complying with his medications. Dr. Gihwala explained that, initially, Mr. Webber was "extremely angry," and he felt that he was being "threatened and persecuted" by individuals in the community. Mr. Webber, however, cooperated with Dr. Gihwala's medical treatment, agreed to have his medications adjusted, and was given long-acting medication in an attempt to maintain his stability over an extended period. Dr. Gihwala recommended outpatient treatment and requested a six-month outpatient commitment. She noted:

At this point Mr. Webber is agreeable to an outpatient commitment to insure outpatient follow up and compliance with his treatment and was urged to speak with his lawyer, which he has done, and he's agreeable to follow through with outpatient commitment which I hereby respectfully request for a period of at least 6 months outpatient arrangement have been made for him to be seen at Footprints Incorporated as well as Pathways in Shelby. Mr. Webber is anxious to be discharged and I am comfortable with his discharge, provided his treatment continues hence the request for the outpatient treatment commitment. I trust that you will grant this order expeditiously.

An involuntary commitment hearing was conducted in district court on 21 May 2007. The resulting order, entered the same day, is a form order published by the Administrative Office of the Courts (Form AOC-SPC-203, Rev. 1/97). The trial court incorporated by ref-

erence Dr. Gihwala's report and based its order on that report. In the findings section of the order, the court wrote in by hand: "This court expresses concern about the ability of this Defendant [sic] to function in [the] community given the significant history of this Respondent to make threatening, suicidal, homicidal statements." The court further found that the outpatient program needed to be in place before Mr. Webber was released from inpatient treatment. The trial court nonetheless concluded that although Mr. Webber was mentally ill and dangerous to others, he satisfied the criteria for outpatient commitment.

The printed form gave the trial court the option of writing on the form a particular number of days of commitment or checking a box for 90 days or 180 days. The court ordered that Mr. Webber be committed for 72 hours at Kings Mountain Hospital and checked the box indicating that the inpatient commitment period would be followed by 180 days of outpatient commitment.

At the request of Dr. Joseph L. Godfrey, Mr. Webber's treating physician for Mr. Webber's outpatient treatment, a second commitment hearing was held on 13 November 2007. On 15 November 2007, District Court Judge Meredith A. Shuford, who had not presided over the first hearing, entered an order (also on the same printed form that had been used for the first outpatient commitment order), finding:

> Based on the testimony of [Dr.] Joseph Godfrey, the treating psychiatrist for the respondent, and the testimony of the respondent, the court finds the respondent is mentally ill and lacks insight that he has psychiatric problems that require treatment, and that the respondent lacks the judgment of when it is appropriate for him to obtain treatment and to continue taking medication that controls his inappropriate behaviors involving threats, suicidal and homicidal ideations. [Dr.] Godfrey believes respondent's need to be medicated for his psychiatric condition will be a life-long necessity. Respondent testified he does not feel like he needs any medication and that he has no mental disability . . . .

Judge Shuford concluded that Mr. Webber was mentally ill but qualified for outpatient commitment. Judge Shuford, therefore, ordered Mr. Webber to be recommitted on an outpatient basis for an additional period of 180 days.

On 12 May 2008, Dr. Godfrey filed another request for hearing and attached his examination and recommendation report. In his report, Dr. Godfrey stated:

I have been treating the patient noted above [who] has been under my care for several months. I have also read his history. He has a long documented history of dependable and predictable non-compliance with treatment recommendations due to lack of insight, resulting in hostile acting out requiring hospitalization due to a reasonable fear of harm to others in the community.

Dr. Godfrey indicated on the hearing request form that the hearing was necessary to determine the appropriateness of Mr. Webber's outpatient treatment.

The commitment hearing was held on 12 and 14 May 2008. Both Mr. Webber and Dr. Godfrey testified. On 14 May 2008, Judge Shuford entered a form order, checking the box incorporating by reference Dr. Godfrey's report "as findings." Written in by hand, Judge Shuford found:

Based on doctor's report and his testimony, court finds respondent is suffering from a mental illness and that the treatment and medication are benefiting [sic] the respondent. That the respondent does not recognize the benefits of the treatment and that it is unlikely he would continue treatment without a court order requiring him to do so, and that if he did not continue treatment his condition would deteriorate and he could likely become a danger to himself or others. This opinion is based on his prior medical history, and prior actions, as well as his current demeanor which indicates he does not recognize his illness and the necessity of treatment.

Judge Shuford concluded that Mr. Webber is mentally ill and is

capable of surviving safely in the community with available supervision from family, friends or others; and based on respondent's psychiatric history, the respondent is in need of treatment in order to prevent further disability and deterioration which would predictably result in dangerousness to self or others. And, that the respondent's inability to make an informed decision to voluntarily seek and comply with recommended treatment is caused by: . . . the nature of the respondent's mental illness.

Judge Shuford ordered Mr. Webber to be involuntarily committed for a third 180-day period of outpatient treatment. Mr. Webber timely appealed to this Court from the trial court's 14 May 2008 order.

**IN RE WEBBER**

[201 N.C. App. 212 (2009)]

## Discussion

As an initial matter, we note that although Mr. Webber's term of involuntary commitment has expired by the terms of the 14 May 2008 order, " 'a prior discharge will not render questions challenging the involuntary commitment proceeding moot.' " *In re Booker*, 193 N.C. App. 433, 436, 667 S.E.2d 302, 304 (2008) (quoting *In re Mackie*, 36 N.C. App. 638, 639, 244 S.E.2d 450, 451 (1978)). When the challenged order may form the basis for future commitment or may cause other collateral legal consequences for the respondent, an appeal of that order is not moot. *See In re Hatley*, 291 N.C. 693, 695, 231 S.E.2d 633, 635 (1977) ("The possibility that respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral legal consequences, convinces us that this appeal is not moot."). We, therefore, address the merits of this appeal.

I

**[1]** Mr. Webber first challenges the trial court's subject matter jurisdiction to enter the 14 May 2008 commitment order. To initiate involuntary outpatient commitment, a petition and affidavit is filed with the clerk of superior court or magistrate alleging that the respondent is mentally ill and either (1) dangerous to self or others or (2) in need of treatment to prevent further disability or deterioration that would predictably result in dangerousness. N.C. Gen. Stat. § 122C-261(a) (2007). If the clerk or magistrate finds reasonable grounds to believe that the facts in the petition and affidavit are true, the respondent is taken into custody to be examined by a physician or eligible psychologist. N.C. Gen. Stat. § 122C-261(b).

If the examining doctor recommends outpatient commitment and the clerk or magistrate finds probable cause to believe that the respondent satisfies the criteria for outpatient commitment, a hearing is conducted in district court to determine the appropriateness of involuntary commitment. N.C. Gen. Stat. § 122C-261(d). At the initial hearing, the trial court may order outpatient commitment or a combination of inpatient and outpatient commitment for a period "not in excess of 90 days." N.C. Gen. Stat. § 122C-271(b)(1)-(2) (2007).

Subsequent commitment proceedings may be initiated if the treating physician determines that the respondent continues to meet the criteria for outpatient commitment. The physician is required to notify the superior court clerk 15 days "before the end of the initial . . . period[] of outpatient commitment . . . ." N.C. Gen. Stat.

§ 122C-275(a) (2007). The superior court clerk then calendars the recommitment hearing 10 days prior to the end of the previous commitment term. *Id.* If the respondent continues to meet the criteria for outpatient commitment, the trial court may order outpatient commitment for an "additional period not in excess of 180 days." N.C. Gen. Stat. § 122C-275(c).

It is undisputed on appeal that the trial court's 21 May 2007 commitment order fails to comply with N.C. Gen. Stat. § 122C-271(b). By statute, the court was only authorized to order commitment (inpatient and outpatient) for 90 days, but, instead, the trial court ordered that Mr. Webber be committed for 72 hours of inpatient treatment and 180 days of outpatient treatment. Mr. Webber contends that his commitment expired as a matter of law, by virtue of N.C. Gen. Stat. § 122C-271(b); after 90 days notwithstanding the period of commitment actually ordered. He further argues that under N.C. Gen. Stat. § 122C-275 any request for recommitment was accordingly required to be submitted 15 days prior to the expiration of the end of the 90-day period and not from the 180-day period erroneously ordered by the trial court. Mr. Webber maintains that because Dr. Godfrey did not request recommitment until 15 days before the end of the 180-day commitment period, Judge Shuford lacked subject matter jurisdiction to recommit him in November 2007 and again in May 2008.

We note that Mr. Webber does not dispute that the trial court initially had subject matter jurisdiction to enter the 21 May 2007 order. Nor does he dispute that each request for hearing was submitted no later than 15 days prior to the expiration of each commitment period ordered by the court. Mr. Webber also does not identify any procedural deficiency in the first rehearing (resulting in the 15 November 2007 order) or the second rehearing (resulting in the 14 May 2008 order) apart from the improper term of commitment set out in the initial 21 May 2007 order.

Mr. Webber's argument hinges entirely on the error in the initial order. N.C. Gen. Stat. § 122C-272 (2007) provides with respect to the initial order that the "[j]udgement of the district court is final." Under N.C. Gen. Stat. § 122C-272, the State or "any party on the record" may appeal to the Court of Appeals, although "[t]he district court retains limited jurisdiction for the purpose of hearing all reviews, rehearings, or supplemental hearings allowed or required under this Part." Since, by statute, the initial order was "final," and Mr. Webber failed to appeal from that order; his argument in this case—attacking the legality of that order—constitutes a collateral attack.

A collateral attack is one in which a party is not entitled to the relief requested " 'unless the judgment in another action is adjudicated invalid.' " *Clayton v. N.C. State Bar*, 168 N.C. App. 717, 719, 608 S.E.2d 821, 822 (quoting *Thrasher v. Thrasher*, 4 N.C. App. 534, 540, 167 S.E.2d 549, 553 (1969)), *cert. denied*, 359 N.C. 629, 615 S.E.2d 867 (2005). "A collateral attack on a judicial proceeding is 'an attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it.' " *Reg'l Acceptance Corp. v. Old Republic Sur. Co.*, 156 N.C. App. 680, 682, 577 S.E.2d 391, 392 (2003) (quoting *Hearon v. Hearon*, 44 N.C. App. 361, 362, 261 S.E.2d 9, 10 (1979)). Collateral attacks generally are not permitted under North Carolina law. *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 601, 646 S.E.2d 826, 830 (2007).

Here, Mr. Webber attempts to invalidate the 14 May 2008 commitment order by asserting that the trial court exceeded its jurisdiction in its initial 21 May 2007 order. Mr. Webber is, therefore, in this appeal, making a collateral attack on the 21 May 2007 order.

While we have found no authority addressing collateral attacks in civil commitment proceedings, in the criminal context, our appellate courts have held that a defendant, who was placed on probation, cannot in a probation revocation hearing attack the sentence imposed in the original proceeding when the defendant did not appeal that sentence. *See State v. Holmes*, 361 N.C. 410, 413, 646 S.E.2d 353, 355 (2007) ("Defendant did not appeal the 2004 judgments, and consequently they became final. Defendant now attempts to attack the sentences imposed and suspended in 2004 in his appeal from the 2005 judgments revoking his probation and activating his sentences. We conclude, consistent with three decades of Court of Appeals precedent, that this challenge is an impermissible collateral attack on the original judgments."); *State v. Rush*, 158 N.C. App. 738, 741, 582 S.E.2d 37, 39 (2003) (holding that by failing to appeal from the original judgment suspending her sentences, defendant waived any challenge to that judgment and thus could not attack it on appeal of subsequent order activating her sentence); *State v. Noles*, 12 N.C. App. 676, 678, 184 S.E.2d 409, 410 (1971) ("Questioning the validity of the original judgment where sentence was suspended on appeal from an order activating the sentence is, we believe, an impermissible collateral attack.").

Mr. Webber, however, argues that this case is analogous to *State v. Surratt*, 177 N.C. App. 551, 553, 629 S.E.2d 341, 342 (2006), in

which this Court held that the defendant's probation term had expired, and thus the trial court lacked jurisdiction to revoke his probation and activate his sentence. In *Surratt*, the defendant was not, however, challenging a prior appealable judgment or order, as Mr. Webber does here and as did the defendants in *Holmes, Rush,* and *Noles.* Instead, in *Surratt,* 177 N.C. App. at 552, 629 S.E.2d at 342, the defendant's sentence was suspended, and he was placed on supervised probation. After the probation had expired, according to the terms of the judgment imposing probation, the trial court entered orders purporting to extend the probation that had already lapsed. This Court held that the State could not revoke the defendant's already expired probation. *Id.* at 553, 629 S.E.2d at 342. Thus, the *Surratt* defendant was actually seeking to enforce the terms of the original judgment rather than attacking them.

Mr. Webber argues further, however, that there is no improper collateral attack because the 21 May 2007 order was void for lack of subject matter jurisdiction. A judgment or order that is void, as opposed to voidable, is subject to collateral attack. *See Clark v. Carolina Homes, Inc.,* 189 N.C. 703, 708, 128 S.E. 20, 24 (1925) (holding that void judgments "yield to collateral attack, but [voidable judgments] never yield to a collateral attack[;] [i]t requires a direct attack to set aside or correct a voidable judgment"). A lack of subject matter jurisdiction renders the judgment or order void. *See Jenkins v. Piedmont Aviation Servs.,* 147 N.C. App. 419, 425, 557 S.E.2d 104, 108 (2001) (" 'A lack of jurisdiction or power in the court entering a judgment always avoids the judgment, and a void judgment may be attacked whenever and wherever it is asserted, without any special plea.' " (quoting *Allred v. Tucci,* 85 N.C. App. 138, 143, 354 S.E.2d 291, 295, *disc. review denied,* 320 N.C. 166, 358 S.E.2d 47 (1987))), *disc. review denied,* 356 N.C. 303, 570 S.E.2d 724 (2002).

Here, Mr. Webber does not dispute that the district court had subject matter jurisdiction over the initial outpatient commitment proceeding. He also does not cite any authority suggesting that a trial court with subject matter jurisdiction could, under these circumstances, be subsequently stripped of jurisdiction. Rather, while Mr. Webber uses the phrase "subject matter jurisdiction," he is actually arguing that the trial court did not have authority to order an 180-day commitment under N.C. Gen. Stat. § 122C-271(b). In *Hamilton v. Freeman,* 147 N.C. App. 195, 204, 554 S.E.2d 856, 861 (2001), *appeal dismissed and disc. review denied,* 355 N.C. 285, 560 S.E.2d 803 (2002), this Court held that despite the fact that the trial court

lacked the authority to impose the sentences that it did, "[s]uch a judgment is voidable, but not void *ab initio*, and is binding until vacated or corrected."

As in *Hamilton*, there is no dispute here that the trial court had authority to adjudicate the issues in dispute and had jurisdiction over the parties. As a result, the trial court's 21 May 2007 order "is not void, even if contrary to law." *Id. See also State v. Wilson*, 154 N.C. App. 127, 131, 571 S.E.2d 631, 633 (2002) ("If contrary to law, the judgment is only voidable, and therefore constitutes a binding judgment of conviction that must be honored until vacated or corrected."), *aff'd per curiam*, 357 N.C. 498, 586 S.E.2d 89 (2003).

Mr. Webber argues further that the trial court's jurisdiction "lapsed" as a matter of law, analogizing this case to *In re K.W.*, 191 N.C. App. 812, 814, 664 S.E.2d 66, 67 (2008). In *K.W.*, this Court held that the trial court lacked jurisdiction to enter an order finding the juvenile delinquent when the delinquency petitions were not filed within the time frame mandated by the governing statute. In *K.W.*, however, the result of the untimely filing was that the trial court never properly obtained subject matter jurisdiction as an initial matter over the delinquency proceedings. In contrast, it is undisputed that the trial court obtained jurisdiction over the civil commitment proceedings in this case when the petition and affidavit were filed pursuant to N.C. Gen. Stat. § 122C-261.

In making his jurisdictional argument, Mr. Webber fails to meaningfully distinguish this Court's holding in *In re Boyles*, 38 N.C. App. 389, 247 S.E.2d 785 (1978), *appeal dismissed and disc. review denied*, 296 N.C. 411, 251 S.E.2d 468 (1979). In *Boyles*, the prior statute governing recommitment proceedings—N.C. Gen. Stat. § 122-58.11(e)—provided that requests for rehearings were required to be submitted 15 days prior to the end of the commitment period. *Id.* at 389-90, 247 S.E.2d at 786. The respondent's doctor requested a recommitment hearing six days prior to the end of the respondent's commitment period. *Id.* at 389, 247 S.E.2d at 786. At the recommitment hearing, the respondent moved to dismiss the proceedings for lack of a timely request for a hearing. *Id.* The trial court denied the motion, and on appeal, the respondent argued that the trial court lacked authority to adjudicate the case because there was no timely request for a hearing. *Id.* at 390, 247 S.E.2d at 786. This Court rejected that argument, holding that "[d]ismissal is too drastic, and unless respondent can show some prejudice the proper action would be to continue the proceeding until ample notice has been given." *Id.*

Similarly, in this case, Mr. Webber argues that due to the error in the initial commitment order, all of the subsequent requests for rehearings were untimely. Under *Boyles*, however, that contention does not entitle him to dismissal of the proceedings.

In addition, Mr. Webber's reading of N.C. Gen. Stat. § 122C-271 is inconsistent with N.C. Gen. Stat. § 122C-272. *See Bd. of Adjustment of the Town of Swansboro v. Town of Swansboro*, 334 N.C. 421, 427, 432 S.E.2d 310, 313 (1993) ("Statutes dealing with the same subject matter must be construed *in pari materia* and harmonized, if possible, to give effect to each."). N.C. Gen. Stat. § 122C-272 provides that the district court's order is "final" and may be appealed. It also provides, however, that jurisdiction continues in the district court for purposes of rehearings. Interpreting N.C. Gen. Stat. § 122C-271(b) as Mr. Webber suggests would produce the illogical result that if the district court exceeded its authority in an initial commitment order, it would then be divested of jurisdiction to hold any rehearings notwithstanding § 122C-272. *See State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Office*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978) ("In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results.").

On the other hand, Mr. Webber was not left without a remedy for the over-long initial commitment period. Apart from appealing, Mr. Webber could have requested a supplemental hearing under N.C. Gen. Stat. § 122C-274(e) (2007), which allows the trial court to "either reissue or change the commitment order or discharge the respondent and dismiss the case." A supplemental hearing would have been a proper method for bringing to the trial court's attention the fact that the commitment period specified in the initial order exceeded the maximum term provided in N.C. Gen. Stat. § 122C-271(b). Mr. Webber could then have requested that the trial court "change the commitment order" to a period of 90 days for the combined inpatient and outpatient commitments. N.C. Gen. Stat. § 122C-274(e).

In sum, we hold that in order to challenge the improper commitment period contained in the 21 May 2007 order, Mr. Webber was required to appeal that 2007 order pursuant to N.C. Gen. Stat. § 122C-272 or to request a supplemental hearing under N.C. Gen. Stat. § 122C-274(e). Mr. Webber may not undo subsequent recommitments by challenging the prior final 21 May 2007 order—entered by a court

**IN RE WEBBER**

[201 N.C. App. 212 (2009)]

with personal and subject matter jurisdiction—that he elected not to appeal. As a consequence of his decision not to appeal that order, Judge Shuford had the authority to subsequently order his recommitment on 14 May 2008.

## II

**[2]** Mr. Webber next argues that Judge Shuford failed to make sufficient findings of fact to support the conclusion that Mr. Webber should be recommitted to another 180 days of outpatient treatment. N.C. Gen. Stat. § 122C-267(h) (2007) requires the trial court "to find by clear, cogent, and convincing evidence that the respondent meets the criteria specified in G.S. 122C-263(d)(1)" and to "record the facts which support its findings . . . ." "A trial court's duty to record the facts that support its findings is 'mandatory.' " *Booker*, 193 N.C. App. at 436, 667 S.E.2d at 304 (quoting *In re Koyi*, 34 N.C. App. 320, 321, 238 S.E.2d 153, 154 (1977)).

To support an order for outpatient commitment, the trial court must find by clear, cogent, and convincing evidence that the following criteria are met:

a. The respondent is mentally ill;

b. The respondent is capable of surviving safely in the community with available supervision from family, friends, or others;

c. Based on the respondent's psychiatric history, the respondent is in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness as defined by G.S. 122C-3(11); and

d. The respondent's current mental status or the nature of the respondent's illness limits or negates the respondent's ability to make an informed decision to seek voluntarily or comply with recommended treatment.

N.C. Gen. Stat. § 122C-263(d)(1) (2007). Mr. Webber challenges the sufficiency of the findings under N.C. Gen. Stat. § 122C-263(d)(1)(c) regarding whether, without treatment, his psychiatric condition would deteriorate and predictably result in dangerousness.

The statutory definition of "dangerousness" includes "dangerous to himself" as well as "dangerous to others." N.C. Gen. Stat. § 122C-3(11) (2007). The term "dangerous to himself" means that within the relevant past:

1. The individual has acted in such a way as to show:

   I. That he would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relations, or to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety; and

   II. That there is a reasonable probability of his suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself; or

2. The individual has attempted suicide or threatened suicide and that there is a reasonable probability of suicide unless adequate treatment is given pursuant to this Chapter; or

3. The individual has mutilated himself or attempted to mutilate himself and that there is a reasonable probability of serious self-mutilation unless adequate treatment is given pursuant to this Chapter.

Previous episodes of dangerousness to self, when applicable, may be considered when determining reasonable probability of physical debilitation, suicide, or self-mutilation.

N.C. Gen. Stat. § 122C-3(11)(a).

The statute defines the term "dangerous to others" to mean that within the relevant past

the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent, and

**IN RE WEBBER**

[201 N.C. App. 212 (2009)]

convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.

N.C. Gen. Stat. § 122C-3(11)(b).

Here, Judge Shuford checked the box on the printed form order indicating that Dr. Godfrey's 12 May 2008 report was being incorporated by reference as findings. In *Booker*, 193 N.C. App. at 437, 667 S.E.2d at 304, this Court addressed the use of the same form. The trial court in that case had checked the box incorporating the doctor's report as findings, as Judge Shuford did here. The *Booker* Court, in considering the sufficiency of the findings of fact, considered both the doctor's report and the findings added to the form by the trial judge. *Id.* We, therefore, do the same here.[1]

In *Booker*, this Court held that the trial court's findings with respect to the respondent's dangerousness to self and others were insufficient because the trial court failed to include any findings beyond the incorporated medical report, which only set out the respondent's sex, age, and race; that the respondent had a history of alcohol dependence; that he was admitted with a manic episode; and that he continued to be symptomatic with limited insight regarding his illness. *Id.*

In contrast to *Booker*, Dr. Godfrey, in his 12 May 2008 report, described his evaluation and treatment of Mr. Webber, stating:

> I have been treating the patient noted above [who] has been under my care for several months. I have also read his history. He has a long documented history of dependable and predictable non-compliance with treatment recommendations due to lack of insight, resulting in hostile acting out requiring hospitalization due to a reasonable fear of harm to others in the community.

In the handwritten additions to the form order, Judge Shuford largely echoed Dr. Godfrey's opinions, finding that although Mr. Webber was benefitting from treatment, he did not recognize its benefits and likely would discontinue treatment if not ordered by a court to continue. Based on Mr. Webber's "prior medical history, and prior actions, as well as his current demeanor which indicates that he does not recognize his illness and the necessity of treatment," Judge

---

1. Mr. Webber does not contend that the incorporation of Dr. Godfrey's report as the trial court's findings constitutes improper delegation of the court's fact-finding duty. This argument apparently was also not made in *Booker*.

**IN RE WEBBER**

[201 N.C. App. 212 (2009)]

Shuford concluded that Mr. Webber's "condition would deteriorate and he could likely become a danger to himself or others."

The trial court's written findings, coupled with the findings "incorporated" from Dr. Godfrey's report, are sufficient to support the trial court's determination that, based on Mr. Webber's psychiatric history, he is in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness. Mr. Webber contends, however, that the findings are inadequate because the trial judge "did not provide any facts about Mr. Webber's medical history, prior actions, or demeanor that showed that his psychiatric condition would deteriorate or that he would become dangerous."

In order to support an order of outpatient commitment, N.C. Gen. Stat. § 122C-263(d)(1)(c) (emphasis added) requires the trial court to find by clear, cogent, and convincing evidence that *"[b]ased on the respondent's psychiatric history*, the respondent is in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness . . . ." Here, Judge Shuford made the findings set out in N.C. Gen. Stat. § 122C-263(d)(1)(c). In addition, Dr. Godfrey's report, incorporated by reference, stated that Dr. Godfrey had "read his history" and Mr. Webber "has a long documented history of dependable and predictable non-compliance with treatment recommendations due to lack of insight, resulting in hostile acting out requiring hospitalization due to a reasonable fear of harm to others . . . ."

In arguing that these findings are insufficient, Mr. Webber relies upon *In re Holt*, 54 N.C. App. 352, 354-55, 283 S.E.2d 413, 415 (1981), in which this Court concluded that the trial court's finding that " 'respondent ha[d] made statements to her husband of a threatening nature' " was "insufficient to sustain a conclusion that respondent was dangerous to others." In holding that the finding was inadequate, the Court noted that "[t]here was no finding . . . and no evidence to support any finding that might have been made, as to when these statements were made, the nature of the threats they contained, or the danger to petitioner reasonably inferable therefrom." *Id.*

The flaw of the order in *Holt* was thus a failure of the trial court to make any finding indicating that the threats were recent and that, accordingly, the respondent was a present danger to others. Here, Dr. Godfrey's medical report, based upon his review of Mr. Webber's psychiatric history, which was incorporated by reference, provided the

facts necessary to establish that Mr. Webber currently meets the criteria for outpatient commitment.

*Holt* does not support Mr. Webber's contention that Judge Shuford was required to make specific findings describing Mr. Webber's psychiatric history. "The trial court is not required to make a finding as to every fact that arises from the evidence but only to those facts which are material to the resolution of the dispute." *Church v. Church*, 119 N.C. App. 436, 438, 458 S.E.2d 732, 734 (1995). As our Supreme Court has explained, "[t]here are two kinds of facts: Ultimate facts, and evidentiary facts. Ultimate facts are the final facts required to establish the plaintiff's cause of action or the defendant's defense; and evidentiary facts are those subsidiary facts required to prove the ultimate facts." *Woodard v. Mordecai*, 234 N.C. 463, 470, 67 S.E.2d 639, 644 (1951). "An ultimate fact is the final resulting effect which is reached by processes of logical reasoning from the evidentiary facts." *Id.* at 472, 67 S.E.2d at 645. While the trial court is required to make "*specific findings* of the ultimate facts established by the evidence," it is not required to recite "the evidentiary and subsidiary facts required to prove the ultimate facts . . . ." *Quick v. Quick*, 305 N.C. 446, 452, 290 S.E.2d 653, 658 (1982). We hold that the trial judge made the requisite ultimate findings of fact and did not, under the circumstances of this case, need to describe Mr. Webber's prior psychiatric history.

Mr. Webber next contends that Judge Shuford's finding that Mr. Webber "could likely" become dangerous does not equate to a finding—as dictated by N.C. Gen. Stat. § 122C-263(d)(1)(c)—that deterioration by Mr. Webber would "predictably result in dangerousness." Citing to dictionary definitions, Mr. Webber argues that "[f]inding that an act 'could' happen is not enough to establish that an act is 'predictable.' " In making this argument, Mr. Webber focuses on the trial judge's use of the word "could" and ignores the word "likely." The term "predictable" is defined as "capable of being foretold." *Webster's Third New International Dictionary* 1786 (1964). *See Perkins v. Arkansas Trucking Servs., Inc.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000) ("In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute."). In turn, "likely" is defined as being "of such a nature or so circumstanced as to make something probable"; "seeming to justify belief or expectation"; "having a better chance of existing or occurring than not"; or "having the character of a probability." *Webster's Third New International Dictionary* 1310. We hold that the terms

"could likely" and "predictably" are sufficiently synonymous. Judge Shuford's findings of fact, therefore, met the statutory requirements.

Mr. Webber has not demonstrated that Judge Shuford's order was inadequate. We hold that Judge Shuford's handwritten findings of fact combined with Dr. Godfrey's incorporated report provide sufficient detail to meet the statutory requirements and to permit appellate review.

## III

[3] In his final argument on appeal, Mr. Webber contends that "there was insufficient evidence to support the trial court's findings that Mr. Webber's condition would deteriorate and that he 'could likely' become dangerous." When the trial court's findings of fact are challenged on appeal, this Court's "function . . . is simply to determine whether there was any competent evidence to support the factual findings made." *In re Monroe*, 49 N.C. App. 23, 28, 270 S.E.2d 537, 539 (1980).

At the hearing on 12 May 2008, Mr. Webber testified that he would voluntarily continue treatment without a court order forcing him to do so. Based on this testimony, the trial court stated that it would "like to hear from Doctor Godfrey on that issue as to why he thinks [Mr. Webber] would not" voluntarily continue treatment.

Dr. Godfrey testified on 14 May 2008, stating that he had studied Mr. Webber's long history of treatment for mental illness and had diagnosed him with a psychotic disorder NOS. Dr. Godfrey explained that he relied on Mr. Webber's psychiatric history because that is "basically what medicine does" and "medicine is basically history." As the basis for his medical opinion that Mr. Webber required continued outpatient treatment, Dr. Godfrey cited his history of "drift[ing] away" from voluntary treatment, indicating that "he would go off medication and become ill again and go back to Broughton." Dr. Godfrey also noted that "[Mr. Webber's] history indicates that he doesn't follow a doctor's advice. He follows the court orders."

Dr. Godfrey testified, in addition, that Mr. Webber's history included incidents of threatened violence that resulted in inpatient commitment. The doctor explained that Mr. Webber's history "[i]nvolve[d] angry letter writing" and that the people mentioned in the letters—"judges and local individuals"—felt that they were being threatened. Dr. Godfrey expressed his opinion that if Mr. Webber "unilaterally" stopped treatment, "within a few months, he

would display the behaviors that caused him to be committed to inpatient treatment would occur again [sic] and then I would probably see him post hospitalization."

Dr. Godfrey also discussed his direct interactions with Mr. Webber, pointing out that Mr. Webber lacked insight into the benefit of his medical treatment. Mr. Webber told the doctor that he did not believe that he needed any medication. In explaining why that statement suggested a need for continued outpatient commitment, Dr. Godfrey testified that he could not "see why anyone would continue something they see no benefit in without some structure to ensure it. People just don't do that." According to Dr. Godfrey, even though Mr. Webber had undergone six months of outpatient treatment, Mr. Webber had not "moved any closer to feeling that medication is benefitting him."

Mr. Webber contends that Dr. Godfrey's testimony regarding Mr. Webber's history of violence and communication of threats is incompetent evidence because it is based on hearsay. Mr. Webber did not object to the admission of Dr. Godfrey's testimony on any basis, much less on the ground that it was impermissible hearsay. Mr. Webber thus failed to preserve this issue for appellate review. N.C.R. App. P. 10(b)(1); *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 195-96, 657 S.E.2d 361, 364 (2008).

In any event, Dr. Godfrey testified as an expert witness. Rule 703 of the Rules of Evidence provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." The Supreme Court has held that it is appropriate for a psychiatrist to base an expert opinion on both the psychiatrist's personal examination of the patient and other information included in the patient's official medical records. *State v. DeGregory*, 285 N.C. 122, 134, 203 S.E.2d 794, 802 (1974).

Dr. Godfrey testified that he learned of Mr. Webber's "angry letters" and incidents of threatened violence through the medical history provided by another doctor at Mr. Webber's outpatient treatment facility who "ha[d] known [Mr. Webber] for a long time and read his writings when he was not medicated . . . ." This kind of information is precisely the type that a medical expert may use as the basis for the expert's opinion. *See State v. Daniels*, 337 N.C. 243, 269, 446 S.E.2d

298, 314 (1994) (holding that psychiatrist may properly base expert opinion—without personally evaluating defendant—on "(1) her review of the evaluations of other doctors who had interviewed defendant; (2) a personal discussion with a doctor in whose care defendant had been placed; and (3) interviews of defendant's friends, employers, and family"), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895, 115 S. Ct. 953 (1995); *DeGregory*, 285 N.C. at 132, 203 S.E.2d at 801 ("[A]n expert witness has wide latitude in gathering information and may base his opinion on evidence not otherwise admissible.").

Mr. Webber nevertheless cites to *Hatley*, for the proposition that Dr. Godfrey's testimony was incompetent and inadmissible because it "rested on second-hand information and speculation." The distinguishing factor between *Hatley* and this case, however, is the fact that in *Hatley*, 291 N.C. at 696, 231 S.E.2d at 635, "[t]he only witness to appear at the commitment hearing in District Court was . . . the mother and neighbor of respondent"—not expert witnesses.

N.C. Gen. Stat. § 122C-263(d)(1)(c), moreover, requires the doctor to rely on the respondent's psychiatric history. As mandated by the statute, the doctor must determine, "[b]ased on the respondent's psychiatric history, [that] the respondent is in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness as defined by G.S. 122C-3(11)[.]" *Id.*

Mr. Webber next argues that there is insufficient evidence of his medical history to support the trial court's finding that Mr. Webber's condition would deteriorate and that he would predictably become dangerous. Evidence of Mr. Webber's medical history came in through the expert testimony of Dr. Godfrey, who had reviewed Mr. Webber's history. Mr. Webber cites no authority requiring that a respondent's medical history be admitted separately from the expert's testimony based on that history. Although Mr. Webber argues that Dr. Godfrey's testimony is "too attenuated to support a finding that Mr. Webber could become dangerous to others," the credibility and weight to be given to the doctor's testimony is an issue for the trial court, as the fact-finder, to resolve. *See Scott v. Scott*, 336 N.C. 284, 291, 442 S.E.2d 493, 497 (1994) ("Questions of credibility and the weight to be accorded the evidence remain in the province of the finder of facts."). The definition of dangerousness, moreover, provides that "[p]revious episodes of dangerousness" are a proper consideration for the trial court in making its determination. N.C. Gen. Stat. § 122C-3(11)(a), (b).

Finally, Mr. Webber contends that Dr. Godfrey only gave a "bare" opinion of dangerousness and that such "conjecture" is inadequate to support the trial court's commitment order. In support of this contention, Mr. Webber points to *In re Hogan,* 32 N.C. App. 429, 232 S.E.2d 492 (1977), and *In re Salem,* 31 N.C. App. 57, 228 S.E.2d 649 (1976), two cases in which this Court held that there was insufficient evidence of imminent dangerousness to self or others. Both *Hogan* and *Salem,* however, presented distinctly different scenarios than the one in this case.

In *Hogan,* 32 N.C. App. at 434, 232 S.E.2d at 495, the only evidence of dangerousness was the evaluation report of the psychiatrist who examined the respondent when she was first taken into custody. In his report, the psychiatrist simply asserted, without explanation, his opinion that the respondent was imminently dangerous to herself or others. *Id.* At the subsequent commitment hearing, however, the psychiatrist contradicted the opinion given in his report, explaining that he "arrived at his opinion that respondent was imminently dangerous to herself or others solely because he felt that her persistence in trying to [religiously] convert someone on the street might cause that person to resist the idea, so that 'they could become physically aggressive toward her.' " *Id.*

In *Salem,* the only evidence relating to dangerousness with respect to one of the respondents was the report of a doctor in which he stated only that the respondent " 'appears mentally unable [to] care for self & probably of imminent danger to self.' " 31 N.C. App. at 61, 228 S.E.2d at 652 (emphasis omitted). No witness testified at the hearing. *Id.* at 58, 228 S.E.2d at 650. In vacating the commitment, the *Salem* Court concluded that "[s]uch evidence is not clear, cogent and convincing." *Id.* at 61, 228 S.E.2d at 652.

Unlike *Hogan* and *Salem,* Dr. Godfrey's testimony went beyond the conclusory assertion that if Mr. Webber failed to continue treatment, his condition would deteriorate and would predictably result in dangerousness. Dr. Godfrey testified that he had studied Mr. Webber's psychiatric history and had personally treated him for several months. He specifically described his interactions with Mr. Webber and statements made by Mr. Webber relating to his outpatient treatment. Dr. Godfrey then explained, based on Mr. Webber's psychiatric history and his experience with Mr. Webber, why he believed that if Mr. Webber were not recommitted, he would "drift[] away" from outpatient treatment. Dr. Godfrey then expressed his expert opinion, based on Mr. Webber's history, that if Mr. Webber failed to continue

treatment, he would display the hostile and aggressive behaviors that led him to be previously committed to inpatient care. A review of Dr. Godfrey's testimony reveals that his evidence went well beyond the naked opinions found to be inadequate in *Hogan* and *Salem*.

Moreover, Judge Shuford's findings of fact were further supported by Mr. Webber's own testimony at the recommitment hearing. When asked by his trial counsel about his treatment with Dr. Godfrey, Mr. Webber responded: "I call it mistreated but according to what terms y'all use, treated is—is correct." Mr. Webber stated that the medication he was taking has "done absolutely nothing to change [him] whatsoever." He explained that he was being prescribed the medication because Dr. Godfrey believed he needed it and because "that's what the Court ordered."

When asked whether he could make decisions for himself regarding his treatment, Mr. Webber responded: "I've been making decisions for myself. I—I've never let nobody make decisions for me unless it involves the Court. When they make the decision, then there's nothing that I can do. Otherwise, I'm totally to my own self. I make all of my own decisions."

When Mr. Webber's trial counsel asked him about whether he believed he was a danger to himself or others, Mr. Webber responded: "I'm not a normal human being, is the way I see it. I—I am abnormal in this society. In this abnormal society." Mr. Webber's counsel also asked whether he ever wanted to physically hurt someone when he got angry, to which Mr. Webber responded: "That comes with the territory."

Dr. Godfrey's testimony, in conjunction with Mr. Webber's own testimony, provides sufficient support for the trial court's determination under N.C. Gen. Stat. § 122C-263(d)(1)(c) that based on his psychiatric history Mr. Webber's "condition would deteriorate and he could likely become a danger to himself or others." *See In re Zollicoffer*, 165 N.C. App. 462, 468-69, 598 S.E.2d 696, 700 (2004) (upholding determination of dangerousness where expert witness' testimony and "incorporate[d]" report indicated that "respondent has a history of chronic paranoid schizophrenia, that respondent admits to medicinal non-compliance which puts him 'at high risk for mental deterioration,' that respondent does not cooperate with his treatment team, and that he 'requires inpatient rehabilitation to educate him about his illness and prevent mental decline' ").

We also note that Mr. Webber's arguments could be read as suggesting that the evidence does not establish that Mr. Webber is, in fact, dangerous. Under N.C. Gen. Stat. § 122C- 263(d)(1)(c), however, the State was only required to prove that Mr. Webber "is in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness as defined by G.S. 122C-3(11)[.]" As our review of the record indicates that the State met its burden of proof, we affirm the trial court's order.

Affirmed.

Judges ROBERT C. HUNTER and STEELMAN concur.